UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JADA MARIE VAUGHN,

        Plaintiff,                        Case No. 20-cv-11658
                                                    Hon. Matthew F. Leitman

v.

BRIAN WILSON, *et al.*,

        Defendants.

_____/

## ORDER RESOLVING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 55, 57)

On October 22, 2018, four Oakland County Sheriff's Deputies – Brian Wilson, Charles Janczarek, Eric Hix, and Ruben Garcia – participated in the arrest of Terrance Vaughn ("Vaughn"). The deputies believed that they saw Vaughn swallow crack cocaine during the course of the arrest, but Vaughn repeatedly denied that he had done so. After the deputies secured Vaughn, two of them transported him to the Oakland County Jail and requested that medical staff evaluate him. Evan Soltis, a member of the jail's health care team, took responsibility for assessing Vaughn. Soltis has admitted (at least once) that the deputies told him that Vaughn may have ingested crack cocaine. Nonetheless, Soltis cleared Vaughn for admission into the jail. A few hours later, Vaughn suffered a seizure, was transferred to a hospital, and died from crack cocaine intoxication.

1

In this action, Plaintiff Jada Marie Vaughn ("Plaintiff"), the personal representative of Vaughn's estate, alleges that the four deputies violated Vaughn's Fourteenth Amendment right to adequate medical care and used excessive force against Vaughn when they arrested him. Plaintiff also claims that Soltis and Danielle Veatch, another member of the jail's medical staff, violated Vaughn's Fourteenth Amendment right to adequate medical care. All of the Defendants have moved for summary judgment. For the reasons explained in more detail below, the Court will (1) **GRANT** summary judgment in favor the deputies because they are entitled to qualified immunity, (2) **GRANT** summary judgment in favor of Veatch because she was not sufficiently involved in the assessment of Vaughn, the decision to admit him into the jail, or the provision of care to him, and (3) **DENY** summary judgment to Soltis because the facts taken in the light most favorable to Plaintiff are sufficient to support a finding that Soltis violated Vaughn's right to adequate medical care.

## I

## A

On October 22, 2018, Vaughn was driving a black Buick Lacrosse in Pontiac, Michigan. (*See* Police Rpt., ECF No. 55-2, PageID.570.) Wilson and Janczarek were on patrol in Pontiac that night, and they saw Vaughn roll through a stop sign. (*See id.*) When Janczarek ran Vaughn's license plate through his car's computer

system, Janczarek learned that Vaughn did not have insurance for his vehicle. (*See id.*; Janczarek Dep. at 29-30, ECF No. 55-7, PageID.676.)

Wilson and Janczarek then activated the lights and siren on their vehicle and initiated a traffic stop. (*See* Janczarek Dep. at 32, ECF No. 55-7, PageID.676.)  But Vaughn continued driving and was "slow to stop." (*Id.* at 32-33, PageID.676-677.) Vaughn eventually came to a complete stop, and Janczarek and Wilson approached Vaughn's vehicle. (*See id.*)  Shortly thereafter, Garcia and Hix joined Wilson and Janczarek on the scene, and they also approached Vaughn's car. (*See* Wilson Dep. at 35, ECF No. 55-4, PageID.585.)

## B

When Garcia approached Vaughn's driver-side window, Garcia saw what he believed to be small "white rocks" of "crack cocaine in [Vaughn's] mouth." (Garcia Dep. at 33, 47, ECF No. 55-6, PageID.646, 649.)  Garcia described the "rocks" as approximately the size of the top of a plunger on a pen or "half of an eraser head." (*Id.* at 33-34, 54, PageID.646, 651.)  When Garcia saw the rocks in Vaughn's mouth, Garcia "reach[ed] in [to Vaughn's car]," "grabbed Vaughn's jawline," and told Vaughn "to spit it out." (*Id.* at 37, PageID.647; Janczarek Dep. at 43, ECF No. 55-7, PageID.679.)  At about this same time, Wilson "got into the backseat of the Buick and [also] grabbed [Vaughn] around the neck and head and attempted to keep him from swallowing the [crack] cocaine." (Police Rpt., ECF No. 55-2, PageID.570-571;

Wilson Dep. at 81-83, ECF No. 55-4, PageID.597.)  Wilson and the other deputies were also "ordering [Vaughn] to spit out whatever [was] in his mouth." (Wilson Dep. at 83, ECF No. 55-4, PageID.597.)

Vaughn did not comply with the deputies' commands to spit out the crack cocaine.  Instead, he "grabbed [Garcia's] arm [and] tried to pull [Garcia's] arm away," "fought against [the deputies'] efforts to stop him from swallowing," and "attempted to not spit out" the rocks of crack cocaine in his mouth. (Garcia Dep. at 38, ECF No. 55-6 PageID.647; Wilson Dep. at 82, ECF No. 55-4, PageID.597.) After Vaughn refused to comply with the command to spit out the crack cocaine, both Wilson and Janczarek struck Vaughn in the mouth several times. (*See* Wilson Dep. at 84, ECF No. 55-4, PageID.597; Janczarek Dep. at 44, ECF No. 55-7, PageID.679; Police Rpt., ECF No. 55-2, PageID.571-572.)  Those deputies did so for two reasons.  First, they wanted to preserve the crack cocaine as evidence. (*See* Wilson Dep. at 44, 81-82, ECF No. 55-4, PageID.587, 597.)  Second, they were concerned that Vaughn's health would be at risk if he swallowed the crack cocaine. (*See id.*; Janczarek Dep. at 92, ECF No. 55-7, PageID.691.)

After Wilson and Janczarek hit Vaughn, he "spit out […] crumbs" or "flakes" of "crack cocaine." (Garcia Dep. at 39, ECF No. 55-6 PageID.647.)  At that point, the deputies then conducted a field test and confirmed that the flakes from Vaughn's mouth were crack cocaine. (*See id.* at 40, PageID.647.)

By that time, all four deputies believed, or at the very least suspected, that Vaughn had swallowed some amount of crack cocaine.  In the police report, Janczarek wrote that "[a]lthough [Vaughn] did spit out some chips of cocaine[,] I saw several more on his lips and tongue *that he was able to swallow*." (Police Rpt., ECF No. 55-2, PageID.571; emphasis added.)  Wilson likewise noted in the police report that Vaughn did not spit out all of the crack cocaine that was in his mouth. Wilson wrote that his "two punches to the right side of Vaughn's jawline" caused Vaughn to "*stop* swallowing and spit out *some* of the cocaine." (*Id.*, PageID.572; emphasis added.)  During Garcia's deposition, he confirmed that while he saw white rocks of crack cocaine in Vaughn's mouth, he only saw Vaughn spit out "flakes" or "crumbs" of the cocaine, not the whole rocks. (Garcia Dep. at 39, ECF No. 55-6, PageID.647.)  Finally, Hix testified that he suspected Vaughn had ingested some amount of crack cocaine, and his conversations with Vaughn on the scene (portions of which are quoted below) made clear that Hix believed Vaughn had ingested some crack cocaine.[1] (*See* Hix Dep. at 67-68, ECF No. 55-5, PageID.627.)

---

[1] During their depositions, the deputies denied knowing for certain that Vaughn had ingested crack cocaine.  But when the Court views the evidence in the light most favorable to Plaintiff, it must accept the version of events described above that all of the deputies either knew or suspected that Vaughn had ingested crack cocaine.

## C

After Vaughn spit out the flakes of crack cocaine, the deputies arrested him and placed in the back of Wilson's squad car.  Janczarek then spoke with Vaughn in order to determine how much crack cocaine Vaughn had ingested.  Vaughn repeatedly denied swallowing any crack cocaine:

> Janczarek: Why don't you just go along with the program, dude.
>
> Vaughn: What you talking about?
>
> Janczarek: How much you swallow? I got to know if I need to get your stomach pumped or not.
>
> Vaughn: What you mean?
>
> Janczarek: How much crack did you swallow?
>
> Vaughn: I didn't swallow no crack…..I don't know what you talking about.

(Patrol Video at 0:10:00; ECF No. 55-8.)  A few minutes later, Hix spoke with Vaughn.  Hix expressed concern that Vaughn may have ingested crack cocaine, and Vaughn again denied that he had done so:

> Hix: Terrance let's be honest with each other. We got enough to charge you, okay. So it doesn't matter if you tell me you ate a kilo or a fucking little rock, alright. I want to make sure you don't fucking fall out on us and die. Like I said, we have enough to charge you – you're getting charged. My concern is how fucking sweaty you are and the condition it looks like you're in. How much did you eat? Enough that we got to get you some medical attention?

Vaughn: Nuh uh.

Hix: Tell me how much ya ate? Like I said it doesn't matter…

Vaughn: Y'all beat me in the face.

Hix: What's that?

Vaughn: Y'all beat me in the face. I didn't eat nothin'.

Hix: Yeah you did, you were spittin' out cocaine/crack, alright. If you tell me you ate a kilo, I'm gonna to take you to the hospital to make sure you don't die. If you tell me you ate an ounce, I'm going to take you to the hospital. If you told me you ate a rock – It doesn't matter – I can't charge you for what you ate.

Vaughn: I didn't eat nothin.

Hix: Okay, so crack was just flinging out of your mouth? I'm trying to be real with you. You're sweating like a motherfucker.

Vaughn: …I'm alright.

Hix: How much did you eat?

Vaughn: I didn't eat nothin.'

(*Id.* at 0:16:52 – 0:18:16.)

## D

Following their discussions with Vaughn, the deputies considered two possible courses of action: taking Vaughn "to the jail to see the nursing staff first" or taking him "to the hospital." (Wilson Dep. at 106, ECF No. 55-4, PageID.603; Hix Dep. at 51, 62, ECF No. 55-5, PageID.623, 626.)  They decided to take Vaughn

to see the jail nursing staff.  Their plan was for Hix and Garcia to take Vaughn to the jail and to inform jail medical staff that Vaughn was suspected of swallowing some amount of crack cocaine.  (*See* Wilson Dep. at 107, 123-124, ECF No. 55-4, PageID.603, 607; Hix Dep. at 11, ECF No. 55-5, PageID.613.[2])

Hix and Garcia followed the plan and drove Vaughn to the Oakland County Jail.  During that drive, Vaughn again repeatedly denied ingesting crack cocaine.  (*See* Patrol Car Video, ECF No. 61-5.)  But he did show potential signs of drug intoxication.  For instance, he mumbled when responding to some of the deputies' questions, and at one point, Hix perceived that Vaughn may have been "fading."  (*Id.*)

## E

When Hix and Garcia arrived at the Oakland County Jail, they spoke to Deputy Ryan Garrard.  (*See* Hix Dep. at 87, ECF No. 55-5, PageID.632.)  Garrard

---

[2] When the deputies decided to take Vaughn to the jail, Wilson completed an "Arrest Slip for Confinement" that was to be provided to jail staff.  (*See* Arrest Slip for Confinement, ECF No. 61-27.)  On that form, Wilson did not say that Vaughn had swallowed any crack cocaine.  (*See id.*)  Wilson believed that he did not need to mention crack cocaine ingestion on the arrest slip because "he had spoken with [] Hix and [Hix] advised [him] that he was going to explain the whole circumstances to the jail staff." (Wilson Dep. at 123-124, ECF No. 55-4, PageID.607.)  Based on that discussion with Hix, Wilson believed that "Hix would tell individuals at the jail that [] Vaughn was suspected of swallowing cocaine." (*Id.* at 124, PageID.607.)  Wilson also did not identify any "medical precautions" on the Arrest Slip for Confinement.  Wilson explained that that section of the arrest slip was for "pre-existing medical conditions." (*Id.* at 123, PageID.607.)

was stationed at the jail's booking desk. (*See id*.)  The deputies told Garrard that

Vaughn "might have ingested … [s]omething white." (Garrard Dep., ECF No. 55-

11, at 17-18, PageID.703-704.)  Based on his conversation with the deputies, Garrard

followed the jail's "standard operating procedure" and "contact[ed] medical staff [so

they] could certify that [Vaughn was] okay" to enter the jail. (*Id.* at 20, PageID.704.)

As part of that "standard operating procedure," the jail's medical staff must

provide "pre-clearance" for an inmate to enter the jail.  That procedure is described

in Oakland County Sheriff's Office Policy 306 ("Policy 306"). (*See* Policy 306, ECF

No. 55-10.)  Policy 306 provides that when deputies bring an arrestee to the jail, "the

medical staff … should be summoned by Booking Unit staff to make the decision if

the inmate must go to the hospital for evaluation before admittance." (*Id.*)  In order

to make that decision, the jail medical staff is required to conduct an "assessment"

of the arrestee, which includes "obser[ving] the [arrestee] closely for any signs or

symptoms of illness, injury, intoxication, or mental impairment." (*Id.*)  The jail

medical team then decides whether to clear the arrestee for entry into the jail or to

send him to the hospital. (*See id.*)

**F**

After Garrard called for a medical evaluation, Soltis and Veatch came to the

booking area.  Both Soltis and Veatch were employed by Correct Care Solutions, a

company that provided medical care to the inmates at the Oakland County Jail. (*See*

Soltis Dep. at 10, ECF No. 55-12, PageID.718.) Soltis is a paramedic and emergency medical technician (*see id.* at 15-16, PageID.719); Veatch is a licensed practical nurse. (*See* Veatch Dep. at 5, ECF No. 57-3, PageID.1036.)

Soltis took responsibility for conducting the "prebook clearance" of Vaughn "to determine whether [he] should be admitted" to the jail or sent to the hospital. (Soltis Dep. at 66-68, ECF No. 55-12, PageID.732.) While Veatch was present for at least some of Soltis' interactions with Vaughn, she did not "participate in any way in the assessment [of Vaughn]." (*Id.* at 67, PageID.732.) In fact, she only accompanied Soltis to the booking area because she needed to "get up from [her] computer and stretch [her] legs." (Veatch Dep. at 28-29, ECF No. 57-3, PageID.1041-1042.) Veatch made herself available "if [Soltis] needed any help or [had] questions," but Soltis "was the one that was in charge of [the assessment]" and Soltis alone "determined if [Vaughn] was going to be cleared [for entry into the jail] or not." (*Id.*)

## G

There is conflicting evidence about what the deputies told Soltis and about what Soltis understood with respect to Vaughn's possible ingestion of crack cocaine. The Court's obligation, of course, is to credit the version of that evidence that is most favorable to Plaintiff. In this unusual case, however, both of the conflicting versions are favorable to Plaintiff – albeit in different ways. One version supports Plaintiff's

claims against the deputies, and the Court must credit that version when assessing those claims.  The other version supports Plaintiff's claim against Soltis, and the Court must credit that version when reviewing the claim against him.  Therefore, the Court recounts below both versions of the evidence as to what Soltis was told and what he believed.

The version that supports Plaintiff's claim against the deputies comes from Soltis' deposition testimony.  In that testimony, Soltis indicated that the deputies did *not* tell him that Vaughn may have ingested crack cocaine. (*See* Soltis Dep. at 73, ECF No. 55-12, PageID.734.)  More specifically, Soltis was asked to describe what the deputies told him, and, in response to that question, he reported being told only that Vaughn "may have swallowed something" and that the deputies "never saw [Vaughn] put anything in his mouth." (*Id.*)  At this same point in his deposition, Soltis further testified that when he asked the deputies what made them think Vaughn had ingested something, they told him they did not know. (*See id.*)

The version of the evidence that supports Plaintiff's claim against Soltis also comes from Soltis' deposition.  After testifying (as set forth above) that the deputies did not say anything about crack cocaine, Soltis later testified that the deputies *did* specifically mention crack cocaine.  More specifically, he said that the deputies told him that Vaughn had "possibly swallowed crack cocaine" and "substance ingestion was possible." (*Id.* at 171, PageID.758.)

While Soltis wavered on whether the deputies told him that Vaughn may have ingested crack cocaine, Soltis clearly testified that he understood both the serious risks posed by crack cocaine ingestion and the urgent need to hospitalize an arrestee where there is even a "suspicion" that the arrestee ingested crack.  He had the following exchange with Plaintiff's counsel:

> Q. If the deputies told you that not only did he put his hands near his mouth, he put crack cocaine in his mouth, he swallowed crack cocaine, we took residue off of his mouth, field tested it onsite and confirmed that it was crack cocaine, would that have changed anything in your mind?
>
> A: Yes. It would have changed the situation one hundred percent.
>
> Q. How would it have changed the situation one hundred percent if they -- the officers told you that they observed Mr. Vaughn swallow cocaine?
>
> A: *It would have changed the situation because then I would have had suspicion that he swallowed something* other than them saying that they didn't see him put anything in his mouth. So I would have had a reasonable suspicion that he did swallow something and I would not have cleared him for entrance.
>
> Q. You would have sent him to the hospital?
>
> A. I would have made the recommendation to send him to the hospital, yes.
>
> [….]
>
> Q: *What if one of the officers just said well, we saw him put things in his mouth. We don't really know if he swallowed anything, but he was spitting up small chips of*

> *crack cocaine onto his lap that we then field tested and confirmed was cocaine?*
>
> A: *That still would have changed it. [....] I would have -- I would have recommended he go to the hospital.*

(*Id.*; objections omitted; emphasis added.)

### H

After Soltis spoke to the deputies, he spoke with Vaughn and conducted at least a preliminary assessment of Vaughn's condition.[3] While Veatch was present for at least part of this assessment, she "walked away" before the assessment was completed. (*Id.* at 72, PageID.733.)  Veatch left the area because Soltis was handling the assessment,  and she had her own "responsibilities that [she had] to take care of." (Veatch Dep. at 122, ECF No. 57-3, PageID.1065.)

During Soltis' initial interaction with Vaughn, Soltis repeatedly asked Vaughn if he had swallowed any drugs, and Vaughn said no. (*See* Soltis Dep. at 73, ECF No. 55-12, PageID.734.)  Soltis then observed Vaughn "follow[] basic directions," and Soltis concluded that Vaughn was "in the right frame of mind." (*Id.* at 134, PageID.749.)

_____

[3] The parties dispute how thorough this initial assessment was and whether Soltis complied with the jail's policies regarding medical pre-clearance assessments when he first evaluated Vaughn.  The Court need to resolve that dispute in order to decide Soltis' motion for summary judgment.

Soltis acknowledged that he did not take Vaughn's vitals at that time, but Soltis explained that "based off [Vaughn's] presentation from me talking to him during that assessment at the time […] from him telling me no adamantly that he didn't swallow anything to [the] same thing from the deputies, [] I didn't think it was necessary [to take Vaughn's vitals] at that time." (*Id.* at 69, PageID.733.)  Ultimately, Soltis "recommended clearance" for Vaughn to be admitted to the jail, and he told the deputies that "there [was] no current medical reason for [Vaughn] not to be accepted at the [jail]." (*Id.* at 87, PageID.737.)

Soltis then accompanied Vaughn to the laundry area of the jail so that Vaughn could change clothes. (*See id.* at 127-128, PageID.747.)  Soltis continued speaking with Vaughn during that time and was able to further observe his behavior. (*See id.* at 140-141, PageID.750-751.)  Veatch was not present for Soltis' interactions with Vaughn in the laundry. (*See* Veatch Dep. at 62, ECF No. 57-3, PageID.1050.)

**I**

Once Vaughn changed clothes, he was placed into what is known as the "uncuff" area of the jail. (Soltis Dep. at 91, ECF No. 55-12, PageID.738.)  That space is a holding cell near the intake area. (*See id.*)

At approximately 1:38 a.m., Vaughn suffered what appeared to be a seizure in the uncuff area. (*See id.* at 92-93, PageID.738-739.)  At that time, Soltis was called back to that area to evaluate Vaughn's condition. (*See id.*)  Soltis then brought

Vaughn to the jail's medical "clinic for an assessment and any further medical treatment." (*Id.* at 94, PageID.739.)  Veatch was also present in the clinic at time. (*See* Veatch Dep. at 107, ECF No. 57-3, PageID.1061.)

In the clinic, Soltis took Vaughn's pulse, evaluated his alertness, orientation, and eye movement, and spoke with Vaughn about how he was feeling. (*See* Soltis Dep. at 105-108, ECF No. 55-12, PageID.742.)  Soltis asked Veatch to take Vaughn's blood pressure at one point because he (Soltis) was attending to other aspects of Vaughn's care, and Veatch did so. (*See* Veatch Dep. at 107, ECF No. 57-3, PageID.1061.)  Soltis noted that Vaughn's blood pressure and pulse were high, but Soltis believed those conditions were caused by the seizure. (*See* Soltis Dep. at 116, ECF No. 55-12, PageID.744.)

At 3:44 a.m., Vaughn told a member of the medical staff that he "fel[t] fine and ask[ed] if he c[ould] go back to receiving housing for breakfast." (Vaughn Medical Records, ECF No. 55-13, PageID.949.)  However, just six minutes later, at 3:50 a.m., Vaughn had a second seizure. (*See id.*)  "After about [five] minutes of seizure activity, [Vaughn] did not come to consciousness." (*Id.*, PageID.950.) Emergency Medical Services were called to the scene, and at 4:03 a.m., Vaughn had no pulse. (*See id.*)  Deputies began CPR, but Vaughn never regained consciousness. (*See id.*)  At approximately 4:10 a.m., Vaughn was transferred to McLaren Oakland

Hospital. (*See id.*, PageID.951.)  He was pronounced dead at 4:41 a.m. (*See* Death Certificate, ECF No. 55-20.)

Following Vaughn's death, an autopsy was performed. (*See* Autopsy, ECF No. 57-7.)  Vaughn's autopsy revealed that a "3 inch, focally disrupted and untied clear plastic bag" was found in his digestive track. (*Id.*, PageID.1196.)  "Inside the bag and outside the bag in the gastric lumen [were] multiple (five to ten) rock-like, white objects ranging from 1/4 inch to 1/2 inch in greatest dimension." (*Id.*)  The cause of death was listed as "drug intoxication." (*Id.*, PageID.1192.)

## II

On June 23, 2020, Plaintiff filed this action on behalf of Vaughn's estate. (*See* Compl., ECF No. 1; Am. Compl., ECF No. 23.)  In Plaintiff's Amended Complaint, she brings the following claims:

- Excessive Force in violation of the Fourth Amendment against Wilson, Janczarek, Hix, and Garcia (Count I); and

- Denial of Medical Services in Violation of the Due Process Clause of the Fourteenth Amendment against Wilson, Janczarek, Hix, Garcia, Soltis, and Veatch (Count II).

As the case progressed, Plaintiff clarified the nature of her claims.  As to her excessive force claim, Plaintiff explained in briefing to the Court that that claim is based on the evidence that the deputies "grabbed Vaughn's jaw" and "punched"

Vaughn in the mouth during the initial traffic stop. (Pl.'s Resp., ECF No. 61, PageID.1263.)

With respect to the claim that the deputies failed to provide adequate medical care to Vaughn, Plaintiff's counsel clarified at the summary judgment hearing that the claim is based upon evidence that when the deputies took Vaughn to the jail, they failed to tell Soltis and other jail staffers that they saw Vaughn ingest crack cocaine. This was a significant clarification because in Plaintiff's summary judgment briefing, she had appeared to take the position that her inadequate-medical-care claim against the deputies was based upon their decision to take Vaughn to the jail rather than directly to the hospital. (Pla.'s Resp., ECF No. 61, PageID.1230. *See also id.*, PageID.1259 where Plaintiff argues that "[t]he arresting deputies were obligated to take Mr. Vaughn to the hospital.")

Finally, Plaintiff explained in her summary judgment briefing that her inadequate-medical-care claim against Soltis and Veatch is based on (1) the decision to clear Vaughn for admission to the jail instead of transferring him immediately to a hospital and (2) the failure to transfer Vaughn to the hospital when, following his admission into the jail, he showed signs of intoxication. (*See* Pl.'s Resp., ECF No. 63, PageID.1550-1551.)

Wilson, Janczarek, Hix, and Garcia filed a motion for summary judgment on July 27, 2022. (*See* Mot., ECF No. 55.)   Soltis and Veatch filed a motion for

17

summary judgment on July 29, 2022. (*See* Mot., ECF No. 57.)   Plaintiff filed responses opposing both motions. (*See* ECF Nos. 61, 63.)   The Court held a video hearing on both motions for summary judgment on March 21, 2023.

## III

## A

Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56.   Under Rule 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56).   When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*   But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

## B

One of the bases upon which Wilson, Janczarek, Hix, and Garcia move for summary judgment is qualified immunity.   "Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Once a defendant raises a qualified immunity defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Id.* "A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457. "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

While courts "have discretion to decide the order in which to engage [the] two prongs" of qualified immunity," under both prongs "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). On the contrary, when ruling upon a motion for summary judgment on a qualified immunity defense, "a court must view the

evidence in the light most favorable to the [party] opposing" the motion. *Id*. (quotation omitted).

In the qualified immunity context, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). Courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Simply put, defining clearly established law "requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 577 U.S. at 13). And this specificity "is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* (quoting *Al-Kidd*, 563 U.S. at 741). Thus, as the Sixth Circuit has explained, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or

constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff*, 134 S.Ct. at 2023).

## IV

The Court begins with Plaintiff's claim that the Defendants provided constitutionally inadequate medical care to Vaughn. For the reasons explained below, all Defendants except for Soltis are entitled to summary judgment on this claim.

## A

Because Vaughn was a pre-trial detainee at the time of his death, his right to adequate medical care arose under the Due Process Clause of the Fourteenth Amendment. *See Trozzi v. Lake Cty., Ohio*, 29 F.4th 745, 751-53 (6th Cir. 2022). In order to prevail on "an inadequate-medical-care claim under the Fourteenth Amendment," a plaintiff "must satisfy [the following] three elements":

> (1) the plaintiff had an objectively serious medical need;
> (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and
> (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

*Id.* at 757-58. This test "ensur[es] that there is a sufficiently culpable mental state to satisfy the 'high bar' for constitutional torts grounded in a substantive due process violation." *Id.* at 758. Thus, "[i]n practice, that may mean that a prison official who

lacks an awareness of the risks of her inaction (because, for example, another official takes responsibility for medical care, a medical professional reasonably advised the official to not act, the official lacked authority to act, etc.) cannot have violated the detainee's constitutional rights." *Id.*

## B

The Court first turns to Plaintiff's inadequate-medical-care claim against Soltis and Veatch. Soltis and Veatch have not asserted qualified immunity as a defense (because that defense is not available to them). Thus, the only question with respect to Soltis and Veatch is whether they provided constitutionally inadequate care to Vaughn. The Court addresses below each element of Plaintiff's inadequate-medical-care claim against Soltis and Veatch.

## 1

In order to satisfy the first element of her inadequate-medical-care claim, Plaintiff must demonstrate that Vaughn had an objectively serious medical need. It is not clear that Soltis and Veatch are challenging Plaintiff's ability to satisfy this element. They include the following argument heading in their summary judgment brief: "Neither the Objective Component, Subjective Component, Nor Reckless Component is Satisfied." (Mot., ECF No. 57, PageID.934.) But they offer no argument as to whether Vaughn's medical condition was objectively serious. Instead, their arguments focus exclusively on whether Plaintiff has shown that they

subjectively disregarded a serious risk to Vaughn's health and safety. (*See id.*, PageID.934-939.)  And the primary authority they cite in this section of their brief – *Hyman v. Lewis*, 27 F.4th 1233 (6th Cir. 2022) – focuses on the *subjective* component of a claim for inadequate medical care.  Finally (and in any event), the Sixth Circuit has "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component" of the deliberate indifference standard. *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (holding that decedent who "likely died of multiple drug intoxication" suffered from an objectively serious medical condition).  For all of these reasons, the Court declines to grant summary judgment in favor of Soltis and Veatch on the ground that Vaughn's condition was not objectively serious.

**2**

To satisfy the second element of her inadequate-medical-care claim, Plaintiff must show that "a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that [Vaughn's] medical needs subjected [him] to an excessive risk of harm." *Trozz*i, 29 F.4th at 757-58.  Here again, it is not clear that Soltis and Veatch are contesting Plaintiff's ability to satisfy this element.  They do not offer any argument specifically directed toward this element.  And it would have been difficult for them to have contested this element in light of the fact that both of them acknowledged that an inmate with

Vaughn's condition – suspected crack cocaine ingestion – should be hospitalized. (*See* Soltis Dep. at 73-78, ECF No. 55-12, PageID.734-735; Veatch Dep. at 91-92, ECF No. 57-3, PageID.1057.)  Finally, Plaintiff's paramedic expert, Alan Dorfman, testified that any "responsible paramedic" would recognize that suspected crack cocaine ingestion posed a "medical emergency." (Dorfman Dep. at 170-171, 174, ECF No. 57-4, PageID.1139-1140.)  For all of these reasons, the Court declines to grant summary judgment in favor of Soltis and Veatch on the ground that Plaintiff has failed to establish the second element of her inadequate-medical-care claim against them.

### 3

Finally, in order to satisfy the third element of her inadequate-medical-care claim, Plaintiff must show that Soltis and Veatch "kn[e]w that [their] failure to respond would pose a serious risk to [Vaughn] and ignored that risk." *Trozzi*, 29 F.4th at 758.  The Court concludes that Plaintiff has presented sufficient evidence to make that showing as to Soltis, but has not done so with respect to Veatch.

With respect to Soltis, the evidence in the light most favorable to Plaintiff is sufficient to support findings that:

1.  Soltis understood that he needed to hospitalize an arrestee if he had a "suspicion" that the arrestee had ingested crack cocaine. (Soltis Dep. at 73-74, ECF No. 55-12, PageID.734.);

2.  Soltis did suspect that Vaughn had ingested crack cocaine.  He had that suspicion because the arresting deputies reported to him that (a)

Vaughn "might have been chewing on something" (*id.* at 171, PageID.758), (b) Vaughn "possibly swallowed crack cocaine" (*id.*), and (c) "substance ingestion was possible." (*Id.*)

3. Soltis nonetheless cleared Vaughn for admission into the jail rather than sending him directly to the hospital.[4]

These findings are sufficient to support the conclusion that Soltis knew that his decision to admit Vaughn into the jail rather than sending Vaughn directly to the hospital posed a serious risk to Vaughn.[5]

Soltis counters that "the [] facts [of this case] are similar to *Hyman*," a case in which the Sixth Circuit affirmed the dismissal of claims against a jail employee who conducted medical checks on an inmate who subsequently died of drug intoxication. (Mot., ECF No. 57, PageID.935.) But *Hyman* is distinguishable. In *Hyman*, the court concluded that the defendant "had no reason to know that [the decedent] had

---

[4] For purposes of Plaintiff's claim against Soltis, the Court uses the version of the facts in which the deputies *did* tell Soltis that Vaughn may have ingested crack cocaine. That version is most favorable to Plaintiff with respect to her claim against Soltis. However, when analyzing Plaintiff's claims against the deputies below, the Court uses the version of facts in which the officers did *not* tell Soltis that Vaughn may have ingested crack cocaine. That version is more favorable to Plaintiff in the context of her claim against the deputies.

[5] While the Court's discussion above focuses on Soltis' decision to admit Vaughn into the jail rather than Soltis' interactions with Vaughn following Vaughn's admission to the jail, the Court will also permit the jury to consider whether the post-admission interactions give rise to Soltis' liability on Plaintiff's inadequate-medical-care claim. As set forth in Plaintiff's brief, there are factual disputes concerning exactly what Soltis did and did not do after Vaughn was admitted to the jail, and the jury must resolve those conflicts in order to determine whether Soltis' post-admission conduct amounts to a deprivation of adequate medical care.

concealed narcotics in his body." *Hyman*, 27 F.4th at 1238. Here, in contrast, the evidence taken in the light most favorable to Plaintiff is sufficient to establish that Soltis was told about possible crack cocaine ingestion and that he did have reason to send Vaughn to the hospital. The Court is not persuaded that *Hyman* entitles Soltis to summary judgment on Plaintiff's claim for inadequate medical care.

The Court concludes, however, that Veatch is entitled to summary judgment on that claim because the evidence is insufficient to support a finding that she knew that her conduct posed a serious risk to Vaughn and that she ignored that risk. The evidence described in detail above shows that Soltis, not Veatch, was responsible for assessing Vaughn and admitting him into the jail. Indeed, Veatch came into contact with Vaughn only because she left her desk to "stretch [her] legs." (Veatch Dep. at 28-29, ECF No. 57-3, PageID.1041-1042.) The evidence further shows that Veatch relied upon Soltis to make all appropriate medical decisions concerning Vaughn's admission to the jail and care. Simply put, the evidence shows that Veatch reasonably concluded that Soltis would assess Vaughn, decide whether to admit him into the jail, and provide all appropriate care to Vaughn. For that reason, the evidence is insufficient to establish that Veatch acted with the state of mind required to find her liable on Plaintiff's inadequate-medical-care claim. *See Trozzi*, 29 F.4th at 758 (observing that a prison official may "lack[] an awareness of the risks of her inaction" where, among other things, "another official takes responsibility for

medical care.").  For these reasons, the Court grants summary judgment in favor of Veatch on Plaintiff's claim for inadequate medical care.

## C

The Court next turns to Plaintiff's inadequate-medical-care claim bought against Deputies Wilson, Janczarek, Hix, and Garcia.  The deputies have moved for summary judgment on this claim based on qualified immunity, and the Court concludes that they are entitled to that immunity.  In addition, Janczarek and Wilson are entitled to summary judgment on this claim on a separate and independent ground.  Plaintiff cannot show that those two deputies knew or should have known that the jail staff would not be informed that Vaughn ingested crack cocaine.

## 1

In evaluating the qualified immunity defense asserted by all of the deputies, the Court proceeds directly to the "clearly established" step of the analysis. *See Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (explaining that court may address steps of qualified immunity analysis in any order).  At that step of the analysis, the Court first identifies the version of the deputies' conduct that is most favorable to the Plaintiff, and then the Court asks whether, at the time of Vaughn's death, it was clearly established that that conduct amounted to a denial of adequate medical care. *See Tolan*, 572 U.S. at 656-57.

In the light most favorable to Plaintiff, the material facts with respect to her inadequate-medical-care claim against the deputies are as follows:  The deputies believed that Vaughn had ingested some amount of crack cocaine, chose to take him for a medical evaluation by the jail health care team rather than to the hospital, told the jail medical team that he may have swallowed something, but did not identify the possibly-swallowed substance as crack cocaine.  Plaintiff has failed to show that at the time of Vaughn's death, it was clearly established that this course of conduct by arresting deputies amounted to a denial of adequate medical care.

Plaintiff has not identified a decision from the Supreme Court or a published decision from the Sixth Circuit (or any other circuit court) holding that conduct like that engaged in by the deputies amounted a denial of adequate medical care.  At the hearing on Defendants' motions, the Court repeatedly pressed Plaintiff's counsel to identify such a case, and he could not do so.  Instead, he directed the Court to the cases cited in Plaintiff's brief.  But those cases do not clearly establish that the deputies' conduct here amounted to the denial of adequate medical care.

For instance, Plaintiff cited the Sixth Circuit's decision in *Burwell*, *supra*, in her brief (*see* Pla.'s Resp., ECF No. 61, PageID.1249), but that decision cannot supply the clearly-established rule here because it was decided several years *after* the events in this case. *See Sumpter v. Wayne County*, 868 F.3d 473, 485-86 (6th Cir. 2017) (explaining that cases "decided *after* the event of this case" could not "clearly

establish the right at issue" because the decisions would not have put the defendant "on notice that her conduct was unconstitutional") (emphasis in original). Moreover, and in any event, *Burwell* is distinguishable. In *Burwell*, the decedent "was discovered unconscious in a pool of vomit." *Burwell*, 7 F.4th at 460. The Sixth Circuit held that because the decedent "laid *unconscious* in that vomit for two hours without any apparent movement[, a]nyone who observed him in that condition would have understood his critical need for medical attention." *Id.* at 465 (emphasis in original). Vaughn's condition while he was interacting with the deputies in the field – where he was conscious and able to communicate, although sweating and occasionally mumbling – was not nearly as dire as the condition of the decedent in *Burwell*. Moreover, the relevant defendant in *Burwell* provided no medical care to the decedent, whereas in this case the deputies brought Vaughn to the jail for a medical evaluation by the jail health care team.

Next, Plaintiff cites two unpublished Sixth Circuit cases: *Bertl v. City of Westland*, 2009 WL 247907 (6th Cir. Feb. 2, 2009) and *Border v. Trumbull v. Franklin Cty., Ky.*, 414 F. App'x 831 (6th Cir. 2011). (*See* Pl.'s Resp., ECF No. 61, PageID.1250.) However, as the Sixth Circuit recently explained, "a plaintiff cannot point to unpublished decisions to meet [her] burden" to identify clearly established federal law. *Bell v. City of Southfield, Mich.*, 37 F.4th 362, 367 (6th Cir. 2022) (asking "how can an unpublished case place a question beyond debate when it

doesn't even bind a future panel of this court?") Thus, neither *Bertl* nor *Border* constitute clearly established law. In addition, both cases are distinguishable. In *Bertl*, the defendant nurse "refused to check on" or "take [the] vital signs" of a prisoner whom other prisoners described as "'unconscious' 'shaking on the floor of the cell' [...] 'did not appear to be breathing' [... and] 'unresponsive, pale and turning a bluish color.'" *Bertl*, 2009 WL 247907, at *7. Here, in contrast, Vaughn's condition while he was in the field with the deputies was nothing like that of the decedent in *Bertl*, and the deputies did seek medical attention – *i.e.*, an evaluation by the jail medical staff – for Vaughn. In *Border*, the decedent showed obvious "signs of physical incapacity, severe intoxication and obvious disorientation." *Border*, 414 F. App'x 838. Here, Vaughn did not display any severe symptoms in the deputies' presence, and he was not incapacitated when he was with them. And, again, the deputies took Vaughn for a medical evaluation.

Plaintiff also relies upon *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005). (*See* Pl.'s Resp., ECF No. 61, PageID.1250.) But *Carter* did not involve a drug overdose and thus is distinguishable on that important basis. Moreover, the decedent prisoner in *Carter* "cried loudly for help and continued to complain that her chest hurt and that she needed to go to the hospital." *Carter*, 408 F.3d at 307. Here, as explained above, Vaughn repeatedly *denied* having ingested crack cocaine and indicated he did not need medical attention.

30

Plaintiff also suggests in her brief that the decision in *Pryor v. Dearborn Police Dep't*, 452 F.Supp.2d 714 (E.D. Mich. 2006), clearly established that the deputies' conduct here constituted inadequate medical care. (*See* Pl.'s Resp., ECF No. 61, PageID.1250-1253.) However, a single district court decision like *Pryor*, "whether published or unpublished," cannot establish "a principle or the proper application of a principle to a set of facts, because such decisions are not binding." *Crehan v. Davis*, 713 F.Supp.2d 688, 696 (W.D. Mich. 2010). *Cf. Camreta v. Greene*, 563 U.S. 692, 709 n.7 (noting that "district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity"); *Decrane v. Eckhart*, 12 F. 4th 586, 600 (6th Cir. 2021) (noting that "[i]t is not obvious that we should even consider [] district-court decisions when identifying the rules that our cases have clearly established"). Moreover, and in any event, *Pyror* is distinguishable on its facts. Two of the defendants in *Pryor* "observed" the decedent in that case "convulsing and banging his head on cement benches, yet failed to seek adequate medical assistance." *Pryor*, 452 F.Supp.2d at 721. Vaughn's condition on the scene with the deputies here never rose to that level of severity. Another defendant in *Pryor* "demanded that [the decedent] admit that he swallowed cocaine before he was provided with medical attention." *Id.* While the deputies here declined to take

Vaughn to the hospital because he denied ingesting crack cocaine, they did not withhold "medical attention" due to that denial.

Another serious problem for Plaintiff is that the closest Sixth Circuit case that the parties have identified for the Court – while admittedly not "on all fours" with the facts here – seems to suggest that the deputies' conduct did *not* constitute the denial of medical care.  That case is *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001).  In *Watkins*, police officers executed a search warrant at an apartment rented by a man named Ralph Watkins. *See Watkins*, 273 F.3d at 684.  Watkins was found "exiting a walk-in closet. A torn plastic bag was found on the floor of the closet, with white crumbs sprinkled around it. A larger piece found nearby was later identified as crack cocaine." *Id.*  After police handcuffed Watkins, they saw him "licking his lips and a pink foamy drool coming from his mouth. One officer also spotted a white speck near Watkins's mouth." *Id.*  The officers asked Watkins if he had ingested any drugs and he said no.  *See id.* He also "explained the licking and discharge by stating that he had knocked his teeth against the bed while he was being handcuffed." *Id.*  "The officers did not inform their supervisors or jail personnel of what they had observed or that Watkins had denied swallowing drugs." *Id.*  In fact, Watkins had swallowed drugs, and he ultimately died of a drug overdose. *See id.* at 685.

32

On appeal, the Sixth Circuit held the officers were not deliberately indifferent to Watkins' serious medical needs. The court based that holding, in part, on the facts that "Watkins repeatedly denied swallowing drugs, provided rational explanations for his behavior, and [said he] did not want medical treatment." *Id.* at 686. The Sixth Circuit highlighted that the officers were not faced with "an incapacitated detainee or one who asked for but was refused medical treatment." *Id.*

Many of these circumstances from *Watkins* are present here. Vaughn repeatedly denied ingesting crack cocaine; he provided a plausible explanation for why he was sweating and mumbling (that the deputies had previously punched him in the mouth); he denied the need for medical treatment; and he was never incapacitated in the deputies' presence. Given the similarities between the circumstances here and those in *Watkins*, the decision in *Watkins* weighs against a finding that the deputies' conduct here clearly amounted to the deprivation of adequate medical care.

Finally, Plaintiff argues that she need not cite a factually similar case because it must have been "obvious" to the deputies that their conduct here violated Vaughn's right to adequate medical care. (*See* Pl.'s Resp., ECF No. 61, PageID.1247-1248.) The Court disagrees. While some constitutional violations are so obvious that liability may attach even "without a body of controlling caselaw," *Colson v. City of Alcoa, Tenn.*, 37 F4th 1182, 1189 (6th Cir. 2022), Plaintiff has not persuaded the

Court that the alleged violation here was sufficiently obvious.  Simply put, the Court cannot say that it should have been readily apparent to the deputies that they were depriving Vaughn of his right to adequate medical care by promptly taking him for a medical evaluation at the jail but failing to give the jail medical staff full information about his condition.[6]

For all of these reasons, the deputies are entitled to qualified immunity on Plaintiff's claim of inadequate medical care.[7]

---

[6] Plaintiff places special emphasis on the evidence that the deputies failed to tell Soltis and others at the jail that they believed that Vaughn had ingested crack cocaine.  However, the deputies have directed the Court to two Sixth Circuit decisions in which that court held that officers did not violate an arrestee's right to adequate medical care where, among other things, the officers failed to communicate to health care personnel that an arrestee may have ingested/used controlled substances. *See Watkins, supra*; *Spears v. Ruth*, 589 F.3d 249, 255-56 (6th Cir. 2009).  Plaintiff has not shown how, in light of those decisions, the deputies' failure to inform Soltis that Vaughn swallowed crack cocaine negates their qualified immunity defense.  While it surely would have been better if the deputies had informed Soltis that Vaughn may have ingested crack cocaine (as they insist they did), their alleged failure to do so does not open them up to liability under the circumstances of this case.

[7] As noted above in Section II, during the hearing before the Court, Plaintiff's counsel clarified that Plaintiff's inadequate-medical-care claim against the deputies rests upon their alleged failure to tell the jail staff that Vaughn may have ingested crack cocaine, not on the contention that they should have taken Vaughn directly to the hospital.  Even absent this clarification – *i.e.*, even if the claim was based on the deputies' decision to take Vaughn to see the jail medical staff rather than to the hospital – the deputies would still be entitled to qualified immunity.  None of the cases cited by Plaintiff (and discussed in text above) clearly establish that a law enforcement officer denies adequate medical care to a detainee suspected of ingesting crack cocaine where, as here, the officer promptly presents the detainee for evaluation by a medical professional.  While the clarification of Plaintiff's claim

**2**

Plaintiff's inadequate-medical-care claim against Janczarek and Wilson fails for a second and independent reason: Plaintiff cannot show that those deputies knew or should have known that the jail medical staff would not be told that Vaughn had ingested crack cocaine. On the contrary, the evidence shows that they reasonably believed that the jail medical team *would* be so informed.

As explained above, Plaintiff's counsel has clarified that the inadequate-medical-care claim against the deputies is based upon Plaintiff's contention that the deputies exposed Vaughn to a serious medical risk when they failed to tell Soltis and the others at the jail that Vaughn may have ingested crack cocaine. But Janczarek and Wilson were not the deputies who took Vaughn to the jail and allegedly failed to tell the jail staff complete information. That was Hix and Garcia. And the evidence shows that the four deputies planned for Hix and Garcia to tell the staff about Vaughn's possible crack cocaine ingestion. (*See* Wilson Dep. at 123-124, ECF No. 55-4, PageID.607.) Because Janczarek and Wilson had a reasonable basis for believing that their fellow deputies would tell the jail staff that Vaughn may have swallowed crack cocaine, they cannot be held liable on Plaintiff's inadequate-medical-care claim. *See Trozzi*, 29 F.4th at 758 (observing that a prison official may

---

is not relevant to the deputies' qualified immunity defense, that clarification is nonetheless significant because it made available to Wilson and Janczarek the meritorious defense discussed in Section IV(C)(2).

"lack[] an awareness of the risks of her inaction" where, among other things, "another official takes responsibility for medical care.").

## V

Finally, the Court turns to Plaintiff's claim that the deputies used excessive force when they attempted to get the crack cocaine out of Vaughn's mouth. The deputies have moved for summary judgment on this claim based on qualified immunity. (*See* Mot., ECF No. 55, PageID.553-558.) The Court agrees that they are entitled to that immunity.

The Fourth Amendment allows officers to "use some degree of physical coercion to make an arrest," but it "requires the amount of force to be objectively reasonable under the totality of the particular circumstances." *Latits v. Phillips*, 878 F.3d 541, 457 (6th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). When determining whether the amount of force used was constitutionally permissible, courts consider three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. As the Sixth Circuit has explained:

> The reasonableness inquiry is an objective one, considered from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions. The court must avoid the 20/20 vision of hindsight, recognizing that

> officers in tense and evolving situations may have to make
> a split-second decision about the amount of force that is
> necessary. The reasonableness analysis thus includes
> some built-in measure of deference to the officer's on-the-
> spot judgment.

*Latits*, 878 F.3d at 547 (internal citations and punctuation omitted).

Here, the Court proceeds directly to the clearly established step of the qualified immunity analysis: whether it was clearly established at the time of Vaughn's encounter with the deputies that the amount and level of force they applied against him was excessive. Plaintiff has not cited any Supreme Court or published Sixth Circuit case that clearly establishes that an officer cannot use a blow to the mouth to remove drugs a suspect may be attempting to swallow in order to preserve evidence and protect the life of the suspect. Instead, she makes two arguments as to why the deputies are not entitled to qualified immunity, but neither persuades the Court to deny the deputies' motion for summary judgment.

First, Plaintiff cites the Sixth Circuit's recent decision in *Meadows v. City of Walker*, 46 F.4th 416 (6th Cir. 2022), for the proposition that "[i]t has been clearly established that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting." (Pl.'s Resp., ECF No. 61, PageID.1263.) Plaintiff's reliance on *Meadows* is misplaced. *Meadows* was decided several years after the events in question here. Thus, as explained above, it cannot have put the deputies on notice their conduct violated Vaughn's rights. *See Sumpter*, *supra*. Second, and

more importantly, Vaughn *was* actively resisting when he was struck in the face. "[A]ctive resistance" includes "physically struggling with, threatening, or disobeying officers" and other actions involving "physical resistance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). Here, as explained above, Vaughn "grabbed [Garcia's] arm [and] tried to pull [Garcia's] arm away." (Garcia Dep. at 38, ECF No. 55-6 PageID.647.) And Vaughn both "fought against [the deputies'] efforts to stop him from swallowing" and "attempted to not spit out" the rocks of crack cocaine in his mouth. (Wilson Dep. at 82, ECF No. 55-4, PageID.597.) Given these facts, the Court cannot accept Plaintiff's argument that Vaughn had a right to be free from the application of force because he was not actively resisting.

Second, Plaintiff cites a prior decision of this Court – *Bibbs v. Allen*, 2014 WL 3956127 (E.D. Mich. Aug. 13, 2014) – for the proposition that it was clearly established that "an officer must give a person time to comply with an order before using force." (Pl.'s Resp., ECF No. 61, PageID.1263.) But even if that rule was clearly established, it is of no help to Plaintiff because the evidence here shows that Vaughn *was* given time to comply with the deputies' repeated orders to spit out the crack cocaine before the deputies hit him in the mouth. As described above, before the deputies hit Vaughn in the mouth, they directed him to spit out the crack cocaine. They struck Vaughn only after he continued to struggle and refused to spit out the crack.

Finally, the deputies are entitled to qualified immunity with respect to the portion of Plaintiff's excessive force claim that rests upon their grabbing of Vaughn's mouth to prevent him from swallowing the crack cocaine. Plaintiff has not cited any case in which any court has held that a law enforcement officer used excessive force under similar circumstances.

For all of these reasons, Plaintiff has not carried her burden to show that the deputies violated Vaughn's clearly established Fourth Amendment rights when they used force against him. The deputies are therefore entitled to qualified immunity with respect to Plaintiff's Fourth Amendment excessive force claim.

## VI

For all of the reasons explained above, **IT IS HEREBY ORDERED** as follows:

- Defendants' Wilson's, Janczarek's, Hix's, and Garcia's motion for summary judgment (ECF No. 55) is **GRANTED** in its entirety. All claims brought against those Defendants are **DISMISSED**.

- Defendants' Soltis' and Veach's motion for summary judgment (ECF No. 57) is **GRANTED** with respect to the deliberate indifference claim brought against Veach. That claim against Veach is **DISMISSED**.

The motion is **DENIED** with respect to the deliberate indifference claim brought against Soltis.  That claim will proceed to trial.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2023

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 30, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126